**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
(Miami Division)

CASE NO.:

RAV BAHAMAS, Ltd.,
a Bahamian Corporation,

      Plaintiff,

v.

GENTING AMERICAS, INC.,
a Delaware Corporation,

      Defendant

_____/

## COMPLAINT

Plaintiff, RAV BAHAMAS, Ltd., a Bahamian corporation ("RAV"), hereby files this Complaint against GENTING AMERICAS, INC., a Delaware Corporation ("Genting Americas" or "Defendant"), and alleges as follows:

### INTRODUCTION

The Capo family immigrated to the United States from Cuba in 1959 to pursue the American dream. With little more than that dream, their patriarch, Gerardo "Gerry" Capo, settled in Miami, where he raised a family and enjoyed success as a real-estate developer. In the late 1990s, the Capo family founded RAV, which would purchase over 700 hundred acres on the island of Bimini, in the Commonwealth of the Bahamas.

Bimini's pristine beaches are perched on the edge of the powerful Atlantic Ocean's Gulf Stream current. About 45 miles due east from Miami, Bimini has a long, colorful history as a pirate's haunt during the 1600s and 1700s, and in the last century, as Ernest Hemingway's favorite fishing spot, and Martin Luther King's quiet place. The Capo family dreamed of building a

vacation destination for Miamians, bustling with homes, resorts, and restaurants, all amid Bimini's white-sand-emerald beaches.

By 2012, the Capo family believed they had identified a partner who could help realize that vision: Genting Group.[1]  The Genting Group is "the world's largest [d]estination [r]esort operator"[2] with "Resorts World" branded properties in Malaysia, the Philippines, the United Kingdom, and the United States, including in Miami, New York City, and Las Vegas. Defendant, Genting Americas, is a wholly owned subsidiary of Genting Malaysia Berhad ("Genting Malaysia"), a publicly traded company that forms part of the Genting Group.

RAV had multiple meetings and conversations with Tan Sri Lim Kok Thay, a/k/a K.T. Lim ("KT"), who was Genting Group's chairman, and with Au Fook Yew ("Colin Au"), who was KT's right-hand person and held several high-ranking positions within the Genting Group. KT and Colin Au convinced RAV that partnering with the Genting Group would help achieve their vision. They convinced RAV that, together, they could build a world-class resort and casino in Bimini, which would yield significant returns for RAV and substantially raise the value of RAV's real estate and other business ventures on the island. Based on those representations, RAV transferred over 20-acres in Bimini to BB Entertainment, Ltd. ("BBE"), a Bahamian company, that RAV co-founded with the Genting Group to develop, own, and operate what would eventually be Resorts World Bimini.

---

[1]     The term "Genting Group" refers to Genting Berhad, a Malaysian entity, and its portfolio of subsidiary companies around the world, which include at least three publicly-traded companies—Genting Malaysia Berhad, Genting Singapore Limited, and Genting Plantations Berhad.

[2]     *See* Genting Americas' Linked-In Page, https://www.linkedin.com/company/genting-americas-inc-/about/ (visited October 7, 2024).

To date, BBE has not distributed any profits to RAV from this venture because Genting Americas, who controls BBE's finances, has used BBE as its financial wasteland. Through its stranglehold over BBE and its finances, Genting Americas has used BBE to conceal a medley of fraudulent activities, which may include, but are not limited to: (1) artificially inflating the profits and valuations of its subsidiaries and other Genting affiliates; (2) misstating income, expenses, and liabilities in the United States of America and abroad; (3) manipulating the debt-to-equity ratios of Genting Group's projects in the United States of America and abroad; (4) violating gaming regulations governing financial reporting, and/or (5) engineering financial windfalls by forcing RAV to absorb 22% of various costs and expenses illegitimately shifted onto BBE's accounting records. What is clear is that Genting Americas' fraudulent accounting practices have drowned BBE in hundreds of millions of dollars in illegitimate debt.

BBE's 2022 Audited Financial Reports reflect total liabilities of nearly a billion dollars (i.e. $885,176,004.00). Only a massive and coordinated fraud could dump nearly a billion dollars of debt on a small island resort, where RAV had already developed most of the significant infrastructure. Genting Americas buried the nearly billion-dollar liabilities in consolidated statements using vague categories of expenses to conceal the fraud from RAV. Genting Americas, at every turn, has deliberately kneecapped RAV's efforts to obtain clarity into the financials, including denying RAV full access to BBE's financial records, and denying its requests for an independent audit. This lawsuit seeks the damages that Genting Americas' continuing fraud has caused, which include, but are certainly not limited to, rendering RAV's contribution to BBE (*i.e.* the 20 acres of land) entirely worthless.

**PARTIES, JURISDICTION, AND VENUE**

1.      This is an action for equitable relief and damages that exceed six hundred million dollars ($600,000,000.00), exclusive of interest, costs, and attorney's fees.

2.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the jurisdictional limits of this Court and is between RAV, a citizen of the Bahamas, and Genting Americas, a Delaware corporation with a principal place of business in New York.

3.      RAV is a Bahamian corporation with an office in Miami, Florida, and registered to do business in Florida. RAV is a closely held corporation. Other than its ownership interest in BBE it has no affiliation to Genting Malaysia or its subsidiaries.

4.      GENTING AMERICAS is a Delaware corporation registered to do business in Florida and, during all times material, maintained offices at 1501 Biscayne Boulevard, Suite 500, Miami, FL 33132. *See* **Composite Exhibit 1** [Genting Americas' Annual Reports filed with Florida's Secretary of State].

5.      Venue is proper in Miami-Dade County, Florida because most of the facts giving rise to the causes of action set forth herein occurred in Miami-Dade County, Florida.

**GENERAL ALLEGATIONS**

I.      **Development of RAV and Genting Group's Relationship.**

6.      Bimini is an island in the Commonwealth of the Bahamas with two main islands, North and South Bimini.

7.      In or around 1998, KT and Colin Au first met Gerry Capo. At that time, KT and Colin Au began to express the Genting Group's interest in Bimini and in pursuing a venture with RAV.

8.     After some meetings in Miami, Genting Group flew Gerry Capo, his wife, and several other Capo family members to Kuala Lumpur and Singapore to show them Genting Group's gaming empire.

9.     While no deal immediately materialized, Gerry Capo and KT stayed in contact throughout the next several years.

10.     In or around 2002, RAV began to develop the northern-most portion of North Bimini.

11.     By 2011, RAV had constructed villas, marinas, recreational areas, retail, and other amenities in North Bimini, collectively the development was then known as "Bimini Bay Resort."

12.     In or around 2011, KT invited Gerry Capo to attend a party that Genting Group was having in Miami to celebrate the Genting Group's purchase of the Miami Herald building, and surrounding properties in downtown Miami (*i.e.* the Hilton and Omni Hotels).

13.     Shortly after that party, KT, Colin Au, and RAV's officers again began discussing a potential partnership.

14.     Throughout the first half of 2012, KT and Colin Au had several meetings—at least ten or more meetings—with RAV's officers in Miami to convince RAV to team up with Genting Malaysia to operate a casino in North Bimini and to further develop the Bimini Bay Resort.  Most of these meetings took place at the Genting Group's Hilton / Omni offices at 1501 Biscayne Boulevard, Miami, FL 33132.

15.     Several of Genting Americas' representatives—including but not limited to, KT, Colin Au, Jessica Hoppe, Christian Goode and Kevin Jones—also participated in those meetings and negotiations with RAV's officers in 2012.

16. At the time of these negotiations, KT was Genting Malaysia's Chairman of the Board and CEO, Colin Au was Genting Americas' President, and Jessica Hoppe was Genting Americas' General Counsel.

17. In addition to the many meetings in Miami, KT and Colin Au again flew Capo family members and their spouses to Malaysia to showcase Genting Group's headquarters and international power in the resorts and gaming sector.

18. Seduced by KT and Colin Au's representations, and believing in Genting Americas' resources and expertise, which it derived from its parent company Genting Malaysia, RAV agreed to form BBE and ultimately transferred over 20-acres of valuable property in Bimini to BBE.

II.   **BBE's Formation, Corporate Structure, and Land Holdings.**

19. On July 18, 2012, BBE was incorporated in the Bahamas. *See* **Exhibit 2,** at p. 7 [BBE's 2013 Audited Financials].

20. At its inception, BBE was owned 50% by RAV and 50% by Genting (USA) Limited, a company registered in the Isle of Man. BBE's 2013 Audited Financials, at p. 7, **Ex. 2**.

21. Genting (USA) Limited is, and was, a subsidiary of Genting Malaysia. *See* **Exhibit 15,** at p. 168 [Genting Malaysia 2023 Annual Report].

22. On February 8, 2013, Genting (USA) Limited assigned all its shares, rights and interests in BBE to BB Investment Holdings, Ltd., a Bahamian entity ("BBIH").

23. Genting (USA), Limited formed BBIH.

24. At all times material, Genting Americas controlled BBIH and Genting (USA) Limited.

25.    At all times material, Genting Americas has owned or otherwise held a beneficial interest in BBIH and Genting (USA) Limited.

26.    During all times material, Genting Malaysia indirectly owned 100% of BBIH and Genting (USA) Limited. *See* **Exhibit 12**, at p. 111 [Genting Malaysia's 2013 Annual Report]; *see also* Genting Malaysia's 2023 Annual Report, at p. 167, **Ex. 15**.

27.    As of December 31, 2015, RAV's share in BBE had been diluted to 22% and BBIH's share increased to 78%.  *See* **Exhibit 4**, at p. 7 [BBE's 2015 Audited Financials].

28.    As of this Complaint, BBE's ownership structure remains (i) BBIH, owning 78% of the shares, and (ii) RAV, owning 22% of the shares.

29.    The corporate chart of BBE is as follows:



30.    As a contribution for its share in BBE, RAV transferred to BBE approximately 20 acres, which is where BBE's Resort now sits. Those transfers occurred as follows:

(a) in or around June 26, 2013, RAV transferred approximately four (4) acres of land in North Bimini to BBE. That land was valued at approximately $12 Million (U.S.). RAV did not receive any cash for that land; instead, that was recorded as a capital contribution from RAV to BBE for $12 Million (U.S.); and

(b) in or around September 11, 2014, RAV transferred over sixteen (16) acres of land in North Bimini to BBE. That land was valued at approximately $25.5 Million (U.S.). RAV received approximately $12 Million (U.S.) in cash for that

land, and the remaining $13.5 Million (U.S.) was recorded as a capital contribution from RAV to BBE.

31.    As of September 2014, RAV's contribution to BBE was land valued at approximately $25.5 Million, for which RAV had not received any money.

32.    In addition to its land contributions, RAV transferred governmental licenses and approvals to BBE, or otherwise assisted BBE in acquiring them as necessary.

33.    Currently, BBE owns an island-resort comprised of a 10,000 square-foot casino, a 305-room hotel with surrounding restaurants, lounges, and a jetty used to dock cruise ships (hereinafter Plaintiff refers to the entire resort property as "BBE's Resort"). BBE's Resort is branded and advertised as "Resorts World Bimini."

34.    In the travel industry, this is considered a small hotel and casino operation. By comparison, the Atlantis Paradise Island Resort in the Bahamas has more than 3,000 rooms, and the Fontainebleau Hotel in Miami Beach, Florida, has over 1,500.

35.    Also, BBE's Resort has fewer rooms than all of Genting Group's North American properties: Resorts World Las Vegas has 3,500; Resorts World Omni (d/b/a Hilton Miami Downtown) has over 500 rooms; and Resorts World New York has over 400 rooms.

**III.    Genting Americas Is a Thread in the Genting Group's Complex Web of Entities.**

36.    Genting Berhad sits at the top of the Genting Group, which is the self-proclaimed world's largest destination-resort operator in the world. Even a simplified version of Genting Berhad's organizational chart heralds its Byzantian structure:



*See* **Exhibit 16**, at p. 20 [Genting Berhad's 2023 Annual Report].

37.     This simplified structure conceals a labyrinth of subsidiaries too numerous to list.

38.     Genting Berhad owns 49.3% of Genting Malaysia, and the other 50.7% of Genting Malaysia's shares are publicly traded on the Malaysian stock exchange.

39.     Genting Malaysia indirectly owns 100% of Genting Americas' shares.

40.    A simplified summary of Genting Malaysia's organizational chart is set forth below:



See Genting Malaysia's 2023 Annual Report, at p. 12, **Ex. 15**.

41.    This abridged Genting Malaysia organizational chart excludes most of Genting Malaysia's approximately 150 different subsidiaries. See Genting Malaysia's 2023 Annual Report, at p. 166-170, **Ex. 15**.

42.    As of December 2023, Genting Malaysia, directly or indirectly, owned and operated resort and casino properties in (a) the Bahamas—BBE, *d/b/a* Resorts World Bimini, (b) Miami, Florida—Resorts World Miami at the Hilton Miami Downtown / The Omni Center, (c) New York—Resorts World Casino New York City, Resorts World Catskills, and Resorts World Hudson Valley, (d) United Kingdom—Resorts World Birmingham and approximately 40 casinos throughout the UK, (e) Egypt—Crockfords Cairo, and (f) Malaysia—Resorts World Genting,

Resorts World Kijal, and Resorts World Langkawi (collectively the "Projects" or "Genting Malaysia Projects"). *See* Genting Malaysia's 2023 Annual Report, at p. 13, 178 – 180, **Ex. 15**.

43.     In addition to these resort entities or holding companies, there is a vast and deliberately tangled web of Genting Malaysia subsidiaries that provide, or purport to provide, services to these resorts.

44.     Genting Malaysia routinely uses its subsidiaries to provide services to its resorts and casinos, allowing it to capture those revenues for the Genting Group. The result is a purposefully complicated and convoluted corporate web.

45.     Genting Malaysia indirectly owns 100% of Genting Americas' shares through two other subsidiaries (Genting East Coast USA Limited and Genting Americas Holdings Limited):



46.     Genting Group's opaque corporate structure, comprised of layer-upon-layer of subsidiaries, helps Genting Americas to conceal its financial improprieties and obfuscate its fraud.

47.     Genting Americas uses Genting Group's web of subsidiaries to:

    (a) arbitrarily move money, assets, and liabilities in and out of those

        subsidiaries, without regard to corporate form,

(b) fraudulently charge management fees for subsidiaries that do no work and perform no services, and

(c) manipulate and misallocate expenses and liabilities.

48.    Ultimately, Genting Americas used Genting Group's corporate structure to saddle BBE with almost a billion dollars of illegitimate debt, effectively wiping out any value from RAV's investment in BBE.

**IV.    Genting Americas Controls the Finances and Operations of Genting Malaysia's Subsidiaries in the United States and the Bahamas, Including BBE's.**

49.    Currently, and at all times material, Genting Americas controlled the Genting Group's entire operations and properties in Miami, New York, and the Bahamas, including BBE.

50.    Alternatively, at all times material, Genting Americas controlled *the finances* of the Genting Group's companies and properties in Miami, New York, Las Vegas, and the Bahamas, including BBE.

> **Jamie M. Sanko** has served as Chief Accounting Officer since December 2017. Prior to joining the Company, from December 2014 to December 2017, Mr. Sanko served as the chief financial officer of Genting Americas Inc., where he was responsible for financial oversight of operations in New York, Miami, Bimini and Las Vegas. From January 2011 to October 2014, Mr. Sanko served as the Director of Finance and as of October 2014, the Chief Financial Officer for Resorts World Casino in New York City. From July 2008 to November 2011, Mr. Sanko was the Reconciliation Manager and Trade Services Manager for DuPont Capital Management

*See* **Exhibit 17**, at p. 20 [Sept. 2018 Empire Resorts, Inc.'s SEC Filing].[3]

51.    To maintain complete control, Genting Americas appoints many of its high-level officers and directors to serve at multiple subsidiaries simultaneously.

52.    During BBE's existence, it has had three different presidents, and each has served as BBE president while simultaneously acting as president of Genting Americas or as an officer of another Genting Group subsidiary:

(a) From approximately February 2013 to October 2014, **Dana Leibovitz** served as President of BBE, and during that same period he also served as:
    i.    President, RWBB Resort Management LTD ("RWBB Resort Management"), and

---

[3]    Genting Malaysia owns and controls Empire Resorts, Inc.

    ii.  President, RWBB Management LTD ("RWBB Management");

(b) From approximately October 2014 to May 2020, **Ed Farrell** served as President of BBE, and during that same period he also served as:
    i.  President, Genting Americas
    ii.  President / Secretary, RWBB Management
    iii.  President, Secretary, and Director, RWBB Resort Management
    iv.  President, Bimini Superfast Limited
    v.  President, Resorts World Omni
    vi.  President, Resorts World Miami
    vii.  President, Resorts World Las Vegas

(c) From approximately July 2020 to present, **Robert DeSalvio** has served as President of BBE, and during that same period he also served as:
    i.  President, Genting Americas

53.    Upon information and belief, during those same time periods, Dana Leibovitz, Ed Farrell, and Robert DeSalvio also served in several other capacities throughout the Genting Group.

54.    Genting Americas also appointed several of its officers and directors to simultaneously serve as officers and directors of BBE, RWBB Resort Management, RWBB Management, and other Genting Group subsidiaries. The table below illustrates the different corporate hats that some of Genting Americas' officers and directors have simultaneously worn:

| Name | Genting Americas | BBE | RWBB Management | RWBB Resort Management | Resort World Miami | Resort World Omni | Genting New York | Bimini Superfast Limited |
|---|---|---|---|---|---|---|---|---|
| Ed Farrell | President | 1. President 2. Chairman, Board of Dir. | 1. President 2. Director 3. Secretary | 1. President 2. Director 3. Secretary | | | | President |
| Robert DeSalvio | President | President | | | | | President | |
| Dana Leibovitz | | President | Authorized Rep. | President | | | | Authorized Rep. |
| Jessica Hoppe | 1. General Counsel 2. Senior VP 3. Secretary | Legal Affairs Officer | Director | 1. Legal Representative 2. Director | 1. General Counsel 2. Senior VP 3. Secretary | Secretary | General Counsel | Manager |
| Hillary Metz | 1. Deputy Gen. Counsel 2. Assoc. Gen. Counsel | Assoc. Gen. Counsel | | | Assoc. Gen. Counsel | | | |
| Kevin Jones | 1. Chief Legal Officer 2. Chief Strategy Officer 3. Secretary | Director | | | 1. General Counsel 2. Senior VP 3. Secretary | | | Authorized Rep. |
| Colin Au | President | Chairman, Board of Dir. | | | | | | |
| Tan Sri Lim Kok Thay (K.T.) | Director | Director | | | | | | Director |
| Aviv Laurence | 1. CFO 2. Senior VP Finance | CFO | CFO | CFO | | | | |
| Jamie Sanko | CFO | CFO | | | | | CFO | |
| Christian Goode | CFO | Director | | Director | | Authorized Rep. | Authorized Rep. | 1. Manager |
| Patricia (Missy) Lawrence | | Director | | | President | President | | |

55.    Upon information and belief, the overlap of directors, officers and employees of Genting Americas with other Genting Group companies is more pervasive than even the above table shows.

**V.    Genting Americas Used Genting Group Subsidiaries to Conceal its Control over BBE's Finances.**

56.    Genting Americas used Genting Group's web of subsidiaries to conceal its control over BBE's operations and finances.

57.    Genting Americas had BBE execute contracts with two management companies: RWBB Management and RWBB Resort Management (collectively the "RWBB Companies").

58.    The RWBB Companies are wholly owned subsidiaries of BBIH and, ultimately, wholly owned subsidiaries of Genting Malaysia. *See* **Exhibit 13**, at p. 154 [Genting Malaysia's 2018 Annual Report] (stating that Genting Malaysia indirectly owns a 100-percent interest in RWBB Resort Management and RWBB Management).

59.    On February 8, 2013, BBE and RWBB Management executed the "Gaming Management Agreement," whereunder RWBB Management would manage BBE's casino and gaming operations. *See* **Exhibit 18** [Gaming Management Agreement].

60.    RWBB Management was responsible for, and controlled every aspect of, the casino's business operations and facility, which included *inter alia* preparing the casino's financial statements and reports, the casino's books and records, and establishing and maintaining the casino's bank accounts.

> 4.22    Accounting and Books of Account.
>
> 4.22.1    Statements and Audits. Manager shall prepare and provide to Owner on a monthly, quarterly and annual basis, financial statements, including a balance sheet and statements of income and expenses for the period covered thereby, and that, after the full year of operation, will include comparative statements of all revenues, and all other amounts collected and received, and all deductions and disbursements made therefrom in connection with the Gaming Enterprise. Manager shall choose from the following nationally recognized independent certified public accounting firms to perform an annual audit of the books and records of the Gaming Enterprise: (i) PricewaterhouseCoopers, (ii) Deloitte & Touche, (iii) Ernst & Young and

Gaming Management Agreement, at Sec. 4.22.1, **Ex. 18.**

> 4.22.2    Books of Account.    Manager shall maintain full and accurate books of account at an office in the Gaming Facility.    Owner and Owner's Inspectors shall have immediate access to the daily operations of the Gaming Enterprise and shall have the unlimited right to inspect, examine, and copy all such books and supporting business records, to verify the daily gross revenues and income from the Gaming Enterprise and access any other Gaming related information the Owner deems appropriate.    Such rights may be exercised through a designated agent, employee, attorney, or independent accountant acting on behalf of Owner, provided that any such designation shall be set forth in a notice to Manager.

*Id.*, at Sec. 4.22.2, **Ex. 18.**

61.    Pursuant to the "Resort Management Agreement," which was executed June 26, 2013, and later amended on February 5, 2015, RWBB Resort Management was to manage BBE's hotel and amenities. *See* **Composite Exhibit 19** [Resort Management Agreement] and [2nd Amendment to Resort Management Agreement].

62.    Under the Resort Management Agreement, RWBB Resort Management was supposed to be responsible for and control every aspect of BBE's non-gaming business operations and properties, which included *inter alia* maintaining complete financial books and records of BBE's resort operations, including the accounting records, and managing and maintaining BBE's bank accounts.

> 4.7    Books and Records.    Manager shall keep or cause to be kept at the Resort complete and adequate books of account and other records reflecting the results of occupancy of the Resort and the Resort Operations in accordance with the Accounting Standards and prudent management practices.    The Owner may at its own expense and through its duly appointed agents, inspect such books and records at reasonable times, and bank accounts online, and during normal business hours, at the Resort.    Manager shall use all reasonable efforts to make available to the Owner all information required by the Owner to comply with its tax reporting and tax prepayment obligations.    All such books and records shall belong to the Owner.

Resort Management Agreement, at Sec. 4.7, **Ex. 19**

63.    Pursuant to the Resort Management Agreement and the Gaming Management Agreement, the RWBB Companies were supposed to be in control of every aspect of BBE's operations. The RWBB Companies, however, did not actually provide the management services they were contracted to provide; instead, Genting Americas provided those services directly and

through other subsidiaries. The RWBB Companies were merely Genting America's instrumentalities to perpetrate its fraud and conceal its financial mismanagement.

64.     Specifically, Genting Americas used the RWBB Companies to conceal the fact that Genting Americas (and not the RWBB Companies) was actually controlling BBE's operations because *inter alia*:

(a) Genting Americas wanted RAV to believe that the RWBB Companies were managing BBE's operations in the best interest of BBE when, really, it was Genting Americas—which was riddled with conflicts of interest—that was managing BBE's operations in the best interest of Genting Americas and the Genting Group; and

(b) Genting Americas wanted to use the additional corporate layers to artificially inflate the "management" fees that BBE would pay. For example, several of Genting Americas' officers and other personnel were also officers of the RWBB Companies and BBE. Yet, the RWBB Companies still charged BBE management fees, while BBE was also paying all or disproportionate percentages of Genting Americas' officers' and employees' salaries under the guise that they were BBE's officers or employees.

65.     Ignoring the requirements set forth in the Resort Management Agreement and the Gaming Management Agreement, Genting Americas, not the RWBB Companies, maintained BBE's financial books and records, which were located at Genting Americas' office in Miami, Florida.

66.     During all times material, BBE had a bank account at Bank of America in Miami, Florida, which Genting Americas also managed and controlled.

**VI.    BBE's Audited Financial Reports Contain Almost a Billion Dollars in Liabilities and Other Irregularities that Can Only Arise from a Systematic Fraud, or Financial Incompetence of the highest degree.**

67.    From 2013 to December 31, 2022, Genting Americas' officers and/or directors selected and worked with the outside auditors, who prepared BBE's audited financial statements. *See* **Exhibits 2** to **11** [BBE's 2013 to 2022 Audited Financials, respectively].

68.    Genting Americas' officers, directors and/or employees provided the outside auditors with the documents and information used to prepare BBE's Audited Financial Statements.

69.    The table below summarizes BBE's revenues, expenses, and interest from its inception to December 31, 2022.[4]

| Year | Revenue | Expenses (Excluding Interest) | Interest Expense | Total Expenses (Including Interest) |
|------|---------|-------------------------------|------------------|-------------------------------------|
| 2013 | $4,811,160 | $22,430,177 | $1,264,169 | $23,694,346 |
| 2014 | $8,650,758 | $49,646,059 | $6,563,653 | $56,209,712 |
| 2015 | $32,512,956 | $69,010,040 | $13,266,327 | $82,276,367 |
| 2016 | $33,270,778 | $97,973,953 | $18,596,670 | $116,570,623 |
| 2017 | $29,653,822 | $94,572,167 | $23,129,781 | $117,701,948 |
| 2018 | $28,518,974 | $74,836,898 | $26,039,544 | $100,876,442 |
| 2019 | $28,634,226 | $65,988,100 | $30,952,310 | $96,940,410 |
| 2020 | $4,074,800 | $43,312,623 | $38,395,139 | $81,707,762 |
| 2021 | $19,882,993 | $55,171,042 | $44,730,707 | $99,901,749 |
| 2022 | $32,232,935 | $63,902,903 | $51,089,810 | $114,992,713 |
| | | | | |
| **Total** | **$222,243,402** | **$636,843,962** | **$254,028,110** | **$890,872,072** |
| Average | $22,224,340 | $63,684,396 | $25,402,811 | $89,087,207 |
| Average (excluding 2020) | $24,240,956 | $65,947,927 | $23,959,219 | $89,907,146 |

70.    Only an outright fraud can explain how a small island-resort that averaged $22 Million in revenue per year for ten years, can accumulate almost a billion dollars of debt in that same span (i.e., an average of $89,907,146.00 in debt per year).

---

[4]    This table is a compilation of the revenue, expense, and interest expense figures included in BBE's Audited Financials. *See generally* BBE's 2013 to 2022 Audited Financials, **Exs. 2 - 11**.

71.     No commercially reasonable actor would incur $89 Million dollars of costs and interest per year to operate a small hotel that generates $22 Million in revenue per year.

72.     While discovery will further clarify Genting Americas' fraudulent accounting practices, BBE's Audited Financial Reports show irregularities, some of which are detailed below:

**A.   _BBE's Liabilities Exceed the Combined Liabilities of all Genting Malaysia's Subsidiaries._**

73.     As of December 31, 2022, Genting Americas had managed to drown BBE with a staggering **$885,176,004.00** of liabilities or debt. *See* BBE 2022 Audited Financials, at p. 4, **Ex. 11**.

74.     To put Genting Americas' plundering in perspective, as of December 31, 2022, Genting Malaysia (which has ***over 150 subsidiaries***, including BBE) had a total of approximately $803,972,234.00 in liabilities.

75.     Stated differently, as of December 31, 2022, BBE's liabilities (i.e. $885,176,004.00) were greater than the combined liabilities of Genting Malaysia and its approximately 150 subsidiaries (i.e. $803,972,234.00). *See* BBE 2022 Audited Financials, at p. 4, **Ex. 11**; *compare* **Exhibit 14,** at p. 125 [2022 Genting Malaysia Annual Report].

76.     Not surprisingly, 99.4% of BBE's total liabilities in 2022 constituted monies owed to Genting Malaysia's subsidiaries.

77.     Upon information and belief, as of the filing of this Complaint, BBE's liabilities have increased.

**B.   _BBE's Audited Financials Contradict BBE's Construction Costs._**

78.     According to BBE's 2022 Audited Financials, BBE borrowed $795 Million "primarily to finance the construction of the gaming facility in Bimini including the construction of a 300 room *[sic]* hotel." *See* 2022 BBE's Audited Financials, at 26, **Ex. 11**.

79.     Contrary to BBE's 2022 Audited Financials, BBE's actual construction costs were not $795 Million; rather, BBE's construction costs were approximately $240 Million.

80.     Below is a table reflecting the timeline and costs for construction of BBE's assets:

| Asset | Dates of Construction | Construction Costs |
|---|---|---|
| Casino | June 2013 – Phase 1 Completed | $26 Million |
| | June 2015 – Phase 2 Completed | |
| Hotel | April 2015<br>Phase 1 Completed<br>(196 Rooms Opened) | $185 Million |
| | November 2015<br>Phase 2 Completed<br>(40 Additional Rooms Opened) | |
| | June 2016<br>Phase 3 Completed<br>(69 Additional Rooms Opened) | |
| Jetty | January 2020 – Completed | $29.7 Million |

81.     The construction costs of BBE's assets totaled approximately $240 million.

82.     The statement in BBE's 2022 Audited Financials, that BBE borrowed $795 Million "primarily to finance the construction . . ." [**Ex. 11**], is false because it is impossible for BBE to have borrowed $795 Million to construct assets that, altogether, cost $240 Million to construct.

### C.     *BBE's Audited Financials Collide with BBE's Construction Schedule.*

83.     According to BBE's 2016 Audited Financials, as of December 31, 2016, several Genting Malaysia subsidiaries (*i.e.* Bimini Superfast Operations, the RWBB Management, Resorts World Miami, and Resorts World Omni, and ABC Biscayne, LLC) had purportedly lent $179,114,249.00 to BBE for its "working capital needs." *See* **Exhibit 5**, at p. 20-21 [BBE's 2016 Audited Financial].

84.     But, as of December 31, 2016, BBE's Resort had only been fully operational for a mere six-month period.

85.     Even if BBE's Resort had been fully functioning for the full three years from 2013-2016, it would not justify "working capital" expenditures of $179 Million.

**D.     *The Debt BBE Purportedly Owes to Resorts World Aviation Makes No Sense.***

86.     According to BBE's 2018 Audited Financials, BBE owed $35 Million of accrued debt to Resorts World Aviation ("RWA"), a Genting Malaysia subsidiary, because RWA has purportedly "provided airlift services to patrons to and from the Casino in Bimini." *See* **Exhibit 7**, at p. 25 [BBE's 2018 Audited Financials].

87.     Additionally, from 2013 to 2018, BBE paid tens-of-millions of dollars to different airlines that had purportedly provided airlift services to BBE.

88.     However, the accrued debt to RWA and the amounts paid to different airlines contradict the expenses that BBE purportedly incurred for "Players transportation" from its inception to 2018. *See* BBE's 2013 - 2018 Audited Financials, **Exs. 2 - 7** (showing that BBE had incurred a total of $6.5 Million of "Players transportation" expenses from its inception to 2018).

89.     The $6.5 Million in "Players transportation" expenses only represents a fraction of the over $45 Million that BBE owes, or paid to, RWA and other airlines.

90.     No basis has been provided as to how or why BBE has incurred a debt that far exceeds the expenses it incurred for "airlift services to patrons to and from the Casino in Bimini."

**E.     *BBE's Audited Financials Falsely State that they were "Approved by the Board of Directors for [I]ssuance."***

91.     BBE's 2013 - 2022 Audited Financial Reports all state they were "Approved by the Board of Directors for issuance on [June 17, 2014; May 29, 2015; June 28, 2016; May 12, 2017; May 2, 2018; May 31, 2019; May 29, 2020; May 7, 2021; April 30, 2022; and April 24, 2023]," respectively. **Exs. 2 - 11**.

92.     Most, or all, of those representations are false because, upon information and belief, BBE did not hold Board of Directors' meetings on those dates.

93.     Also, on those dates, BBE's Audited Financial Reports were never sent to RAV's representatives sitting on BBE's Board of Directors ("BBE's Board" or the "Board").

## VII.   From 2013 to 2015, Genting Americas Limited RAV's Access to BBE's Financials to Conceal its Fraud.

94.     From its inception to the present, BBE's Board met approximately fifteen (15) times. *See* **Exhibits 20** to **34** [2014 – 2024 BBE Board Meeting Minutes, respectively].

95.     At least nine (9) of BBE's Board Meetings took place in Genting Americas' offices in Miami, Florida.  *See* BBE Bd. Mtgs., **Exs. 24, 25, 26, 27, 28, 29, 32, 33,** and **34**.

96.     BBE's Board has always had five directors—two appointed by RAV and three appointed by Genting.

97.     From 2013 to 2015, Genting Americas concealed BBE's financial picture from RAV. During those years, RAV's appointed directors sitting on BBE's Board were only shown "summaries" of BBE's financials, or otherwise shown the financials for a particular month.

> 7.  Financials
>     a.  Ann Kennedy provided summary of 2013 results for Resort, BBE and Ship as well as January 2014 financial results for the three operations.

Feb. 21, 2014 BBE Bd. Mtg., at p. 3, **Ex. 20**.

> Reports under all agreements and waiver of reports:
> C. Goode provided summary of reports and budgets and moved that past reports and budgets are waived without incident if not delivered to date and going forward the reports and budgets will be prepared and accepted. All directors agreed.

Aug. 8, 2014 BBE Bd. Mtg., at p. 1, **Ex. 21**.

> 4.  Financial Review of Operations
>     a.  EF provided financial overview of 2014 and noted going into Q1 of 2015 losses have dropped 55%. SuperFast reduction of 42% in loss. Revenues from resort

Mar. 19, 2015 BBE Bd. Mtg., at p. 1, **Ex. 22**.

98.    BBE's 2013 Audited Financials state that they were prepared and approved as of June 17, 2014. *See* BBE's 2013 Audited Financials, at 3, **Ex. 2**. But, during the August 8, 2014 BBE Board of Directors' Meeting, Christian Goode, who was Genting Americas' CFO, asked BBE's Board of Directors to "waive" the contractual rights to receive financial reports because—according to Mr. Goode—BBE did not have any such reports ready to share with the Board. *See* BBE Aug. 8, 2014 Directors Mtg., at 1, **Ex. 21**. Both of those statements cannot be true.

99.    Upon information and belief, Genting Americas did not share BBE's 2013 to 2014 Audited Financials, with RAV until approximately 2019.

100.    Genting Americas would regularly mislead RAV as to BBE's financial outlook.

101.    For example, on December 25, 2015, Jessica Hoppe, who was Genting Americas' General Counsel, emailed the agenda for the BBE Board Meeting held December 26, 2015, and BBE's "2016 Operating Budget." *See* **Composite Exhibit 44** [Dec. 26, 2015 Bd Mtg. Agenda, and 2016 Operating Budget]. The 2016 Operating Budget estimated that BBE would generate $75.1 Million in revenues and $68.0 Million in costs during 2016 [**Ex. 44**, at 3]; however, BBE's 2016 Audited Financials show that, in 2016, BBE generated only $30.7 Million in revenues and $97.9 Million in costs [**Ex. 5**, at 7].

102.    In other words, the 2016 Operating Budget overestimated BBE's revenues by over 120%, and underestimated the costs by over 40%.

**VIII.    From 2016 to 2019, Genting Americas Continued to Pretend that BBE's Inflated Costs were Legitimate, and Created a False Expectation that it was Reducing BBE's Cost Structure.**

103.    BBE's 2016 and 2017 Audited Financials were not discussed until the January 2018 BBE Board Meeting because, upon information and belief, from 2016 to 2017, BBE did not hold

a Board of Directors' meeting. *See* Jan. 22, 2018 BBE Bd. Mtg., at 1, **Ex. 24** (stating that "[t]his meeting will cover the financials of 2016, 2017, 2018 instead of doing multiple presentations.").

104.     During that January 2018 BBE Board Meeting, Genting Americas provided the "2017 unaudited financials," which revealed that BBE had experienced a $46 Million Net EBITDA loss. *See* Jan. 22, 2018 BBE Bd. Mtg., at 1, **Ex. 24**. Genting Americas pretended that BBE's exorbitant expenses that year were legitimate, and it concealed the fact that the fraudulent allocation of millions of dollars of expenses and debt to BBE caused the loss.

105.     During the January 2018 BBE Board Meeting, Genting Americas misrepresented that in 2017 it had made "*large* reductions in [BBE's] cost structure." *See* Jan. 22, 2018 BBE Bd. Mtg., at 1, **Ex. 24** (emphasis added). But that was false because, as RAV would later learn, BBE's expenses of $97 Million in 2016 had only been reduced a mere 3.5% to $94 Million in 2017.

106.     Following the January 2018 BBE Board Meeting, RAV insisted on having several more meetings to ensure closer oversight of BBE's financials.

107.     Altogether, in 2018 and 2019, BBE held nine Board Meetings. During those meetings, Genting Americas continued to pretend it was addressing BBE's exorbitant expense structure, and convinced RAV that it was focused on cutting BBE's costs.  Below are excerpts of BBE's Board Meeting Minutes throughout 2018 and 2019:

(a) "In 2017 there was a **large reduction in cost** structure." *See* Jan. 22, 2018 BBE Bd. Mtg., at 1, **Ex. 24**.

(b) "BBE 2018 budget- we are **reducing the costs** by 19%[.]" *See Id*., at 1, **Ex. 24**.

(c) "Discussion of how our **total expenses came down** and we are slightly below our plan by about $1 million[.]" *See* Apr. 24, 2018 BBE Bd. Mtg., at 1, **Ex. 26**.

(d) "Discussion of our **labor cost** which have been **cut in half**[.]*" See Id*., at 1, **Ex. 26**.

(e) "**Expenses continue to be lower** due to efforts to maximize labor . . . ." *See* Jul. 24, 2018 BBE Bd. Mtg., at 1, **Ex. 27**.

(f) "Year over Year **expenses declined** by $2.8M." *See* Apr. 26, 2019 BBE Bd. Mtg., at 1, **Ex. 30**.

(g) "Reorganization on the gaming side has **led to cost savings** and reduced volatility of the product." *Id.*, **Ex. 30**.

(h) "Our gaming **losses have been drastically reduced** from prior periods with **our new conservative approach.**" *Id.*, **Ex. 30**.

(i) "**Expenses have been reduced** by $2.8M to prior year." *See* Jul. 26, 2019 BBE Bd. Mtg., at p. 1, **Ex. 31**.

(j) "YTD - We have **reduced our expenses** by over $5.6 million to prior year and $5.3M to budget." *Id.*, **Ex. 31**.

(k) "**Reductions are due to better management** of labor and taking control of our utilities costs through metering have helped the reductions." *Id.,* **Ex. 31**.

(l) "**Expenses are down** (5.9%) . . . . Resort is $10 million better than last year at this time, so **losses are reduced**. Resort is beating budget YTD and last year significantly." *See* Oct. 25, 2019 BBE Bd. Mtg., at p. 3, **Ex. 31**.

[Emphasis added to above excerpts].

108.    Despite these assurances, BBE's 2019 Audited Financials show that BBE lost $69 Million in 2019. *See* BBE 2019 Audited Financials, at p. 5, **Ex. 8**.

109.    Notably, at the January 25, 2019 BBE Board Meeting, Genting Americas presented a budget showing that BBE would only lose $19 Million in 2019; yet, BBE went on to lose $69 Million in 2019. *See* Jan. 25, 2019 BBE Bd. Mtg., at 1, **Ex. 29**; *compare* BBE 2019 Audited Financials, at 5, **Ex. 8**.

110.    Not having seen any improvement in BBE's financials or cost structures, on October 25, 2019, BBE's RAV-appointed directors requested a series of documents and reports to better analyze BBE's financial condition. *See* **Exhibit 37** [Document Request List].

111.     Genting Americas delayed RAV's access to the information RAV had requested, and it provided RAV with incomplete and often illegible or incomprehensible information that prevented RAV from conducting a meaningful financial review.

112.     In early 2020, RAV sent multiple letters to Ms. Hilary Metz, Genting Americas' General Counsel, informing her of the deficiencies with the documents and information RAV had received as of that date. *See* **Exhibits 38** and **39** [RAV's Correspondence dated, February 3, 2020 and February 4, 2020, respectively].

**IX.    In March 2020, Genting Americas' President Admitted to Dumping Hundreds-of-Millions of Dollars of Fraudulent Expenses and Debt onto BBE's Accounting Records, and Continuously Promised to Fix It.**

113.     On March 3, 2020, BBE held a Board Meeting in the morning (the "March 2020 Board Meeting"), and a Shareholders Meeting in the afternoon (the "March 2020 Shareholders' Meeting"). Both meetings took place at Genting Americas' office in Miami, Florida.

114.     At the March 2020 Board Meeting, the Board discussed the status of several missing documents and information that RAV had requested.

115.     During that same meeting, the RAV-appointed Directors raised concerns over the proposed budget for 2020. Their concerns included, but were not limited to, the excessive expenses, executives' salaries, deficient revenues, and estimated losses that were in the 2020 proposed budget. However, Genting Americas' officers and personnel present at the meeting could not answer any questions relating to those concerns.

116.     Also, at that meeting, the RAV-appointed Directors requested an explanation for how Genting Americas determines the salary allocation for the Genting employees, who provided shared services to BBE. In response, Genting Americas admitted that it had been "overcharging" BBE for the salaries of other Genting affiliates' employees.

> - It was asked how to determine salary allocation for RW Employees provided shared services.
>     - RW Board members admits that they RW has been overcharging BBE (and thereby RAV) for salaries and there may be many more Genting employees included in RW's allocation than is fair. RW Board members provided that they will have to retroactively analyze the numbers and see the total amount of Genting and Genting affiliates' employee salaries that was allocated to BBE since the beginning.
>     - **Outcome: RW will review the salaries of Genting employees charged to BBE, including the percentage of said employees' salary that was charged and paid for by BBE, and report back to RAV. Thereafter, RAV and RW will need to determine how to move forward.**

*See* Mar. 3, 2020 BBE Bd. Mtg., at 4, **Ex. 33**.

117.    Genting Americas represented that it would "retroactively analyze the numbers and see the total amount of Genting and Genting affiliates' employee salaries that was allocated to BBE since the beginning." Mar. 3, 2020 BBE Bd. Mtg., at 4, **Ex. 33**. RAV and Genting needed that analysis so they could "determine how to move forward." *Id.*

118.    Despite several requests for same, Genting Americas never provided the report or information identifying the employees' salaries that it has overcharged to BBE.

119.    At BBE's March 2020 Shareholders' Meeting, RAV's representatives repeated the requests and the need for more detailed accounting information, and they expressed their concerns about the validity of BBE's expenses and debt. *See* **Exhibit 35**, at p. 3 [2020 Shareholder Mtg.].

120.    Specifically, RAV highlighted the debt that BBE owed to Bimini Superfast Operations.  In response, Edward Farrell—who at the time occupied a Cerberus-like role as Genting Americas' President, BBE's President, and the RWBB Management's President, and RWBB Resort Management's President—**admitted, "there was about $150 million in expenses that we [Genting Americas] could not figure out what to do with, and they ended up in BBE's books."** *Id*., at 3, **Ex. 35**. [Emphasis added].

121.    Below is the excerpt of that exchange:

> 4. <u>Status of and discussion on missing financial reporting (per attached list) including but not limited to sale of Bimini Superfast.</u>
>    - AC: In December 2019, RAV's BBE board members received several year's BBE's Audited Fincial Reports, most of which had not been previously provided to RAV. We have significant concerns regarding BBE's financials, and we have doubts concerning the validity of the expenses and debt that appears in those reports. We want to make a broad declaration that we need BBE's financial records, as we are entitled to all of them as shareholders. Our prior requests for financial records were largely disregarded. And, as for financial documents we have received, they are either incomplete or in an unusable form making it impossible to meaningfully review. The audited reports reflect that BBE owes money to BSO but we don't know what for. Initially, the Superfast and revenues it generated were to be exclusively for Getning, but BBE put money toward building the Jetty so that it could dock, and in exchange RAV and BBIH was supposed to have a share of profits, but not in its losses. However, we did not receive any payments and, now, it looks as though those losses were transferred to BBE.
>    - ML: Aviv will have to add some documents that have not been digitalized.
>    - EF: At some point in time there was about $150 million in expenses that we could not figure out what to do with, and they ended up in BBE's books. We will need to review and account for it.
>    - AL: We will add RR, AC, and TJ to syndtrack to be able to access the documents.

*Id.*, at 3, **Ex. 35**.

122.   Mr. Farrell assured that **Genting would "review and account for it."** *Id.*, at 3, **Ex. 35**. [Emphasis added].

123.   Based on Mr. Farrell's admission, RAV requested access to all of the Bimini Superfast Operation financials and supporting documents; but, according to Patricia Missy Lawrence, who was a Genting-appointed director of BBE, those documents were in "storage" because they "ha[d] not been digitalized." *Id.*, at 3, **Ex. 35**.

> - MG: We were supposed to get reports from Superfast 10 days after the month, even if it was a loss, but we never received them.
> - ML: The BSO documents are in boxes in storage because they have not been digitalized.
> - AE: We are more than happy to review the documents at your office. We can set up a date when we can go into the office and look through the documents and isolate which ones are relevant.
> - KJ: Let us focus on the ferry concession agreement, and see if on the sale of the BSO there is money owed.

*Id.*, at 3, **Ex. 35**.

124.   Two months later, in May 2020, Genting removed Mr. Farrell as a Director of BBE and terminated him as Genting Americas' President and all the other positions he held at the various Genting Malaysia subsidiaries.

**X.**   **From 2020 – 2023, RAV Continued Making Good-Faith Efforts to Obtain the Documents Necessary to Determine the Extent of the Financial Misallocations, and Work with Genting in Correcting the Misallocations.**

125.   As of June 2020, Genting Americas had not provided RAV with the documentation it had requested late in 2019. The documents Genting Americas had provided RAV as of June 2020 were incomplete and otherwise suffered from a host of deficiencies, including providing copies of financial spreadsheets that had been converted to PDF.  That rendered the PDFs illegible and impossible to understand for the following reasons: (a) the financial reports were unlabeled, (b) the financial reports contained information in microscopic columns and numbers, and (c) the financial reports did not contain page breaks or column orientations, making it impossible to decipher the proper sequence and relation of the numbers appearing in the various columns and rows that contained no headings.

126.   Based on the deficient document production, RAV demanded a full audit of BBE's accounting records. *See* **Exhibit 40** [June 22, 2020 Notice of Inspection].

127.   On July 14, 2020, to carry out its inspection and audit rights, RAV representatives conducted a site visit to Genting Americas' office in Miami, Florida. However, that inspection proved futile because (i) again, many of the documents that Genting Americas provided were unusable, (ii) again, RAV representatives were told that the Bimini Superfast documents were not available in digital format, and (iii) it was the height of the Covid-19 Pandemic, and RAV's accountants could not physically conduct the audit on-site at Genting Americas' office. *See* **Exhibit 41** [July 15, 2020 Email].

128.   RAV requested that its accountants be given remote digital access to BBE's financial records, but Genting Americas refused.

129.    BBE's 2019 Audited Financials state they were "[a]pproved" by BBE's Board on May 29, 2020, but that was not true because the RAV-appointed BBE directors did not receive BBE's 2019 Audited Financials until December 23, 2020, when they were first sent by Genting Americas' CFO, Aviv Laurence. *See* **Exhibit 42** [Dec. 23, 2020 Email].

130.    On January 13, 2021, three weeks after receiving BBE's 2019 Audited Financials, RAV objected to them because, as of that date, RAV had still not been permitted to electronically access BBE's financials, which was interfering with RAV's ability to conduct a comprehensive review of said financials.

---

**R A V**  B A H A M A S

January 13, 2021

Chet Koch, Vice President of Finance
Resorts World Bimini
1501 Biscayne Blvd., Suite 500
Miami, FL 33132

RE: BB Entertainment, Ltd ("BBE") 2019 Audited Financial Statements

Dear Chet,

Thank you for providing the BBE 2019 Audited Financial Statements and accompanying information. As you know, we have requested on several occasions to have our accountants conduct a comprehensive review of BBE's financials and supporting records. We are still waiting to be granted electronic access need to begin that review. Without our comprehensive review we cannot meaningfully approve the financials you have just provided. Accordingly, we hereby renew our objection to BBE's financials, and we demand to be given access to BBE's access forthwith.

Regards,

Alejandro Capo, CEO
RAV Bahamas Limited

---

*See* **Exhibit 43**, [Jan. 13, 2021 Objection to BBE's 2019 Audited Financials].

131.    At the January 27, 2022 Board Meeting, RAV emphasized the importance of having "transparency and a good relationship" with Genting. *See* Jan. 27, 2022 Bd. Mtg., at 1, **Ex. 34**.

RAV, again, requested the breakdown of the "shared services" expenses, including the breakdown of the shared "administrative expenses" and shared "employee related costs," and RAV expressed its frustration with the lack of transparency and lack of documentation provided. *Id.*

132. In response, Genting Americas' Chief Legal Officer, Kevin Jones, confirmed that RAV would receive a "[d]etailed breakdown of the debt," as BBE's management agreements required. *See* Jan. 27, 2022 Bd. Mtg., at 1, **Ex. 34**.

**XI.** **In 2024, it Became Clear that Genting Americas Would Never Provide the Debt Breakdown or Other Documentation RAV Needed, and that its Prior Promises to Fix BBE's Financials were Worthless.**

133. As of March 12, 2024, Genting Americas had still not provided any explanations for the debt breakdown or the breakdown of the "shared expenses," including the shared administrative expenses and shared employee related costs. *See* Mar. 12, 2024 Bd. Mtg., at 1, **Ex. 36**. And, yet again, Genting Americas made more false promises to do so. *See* Id.

134. During the March 2024 Shareholders' Meeting, RAV learned that Genting Americas had "approached realtors" in an effort to sell BBE's Resort. It was at that time that RAV realized that Genting Americas' plan was to sell the BBE Resort without ever addressing or rectifying the massive misallocations of debt and expenses reflected in BBE's financial records.

135. Because the estimated value of BBE's Resort is substantially less than the approximately $900 Million in liabilities that remain on BBE's financials, Genting Americas has effectively deprived RAV of the entire value of RAV's over 20-acre contribution without having ever received any return for that contribution.

136. Genting Americas has also deprived RAV of any upside or profit from the sale of BBE's Resort.

137.    After the March 2024 Shareholders' Meeting had adjourned, RAV made its final demands for Genting Americas to correct its fraudulent accounting, but, to date, Genting Americas has failed to do so.

138.    Plaintiff has hired the undersigned law firm in connection to this case and is obligated to pay it reasonable attorneys' fees.

139.    All conditions precedent for filing this Complaint have either occurred or been waived.

## COUNT I
### (FRAUD)

140.    Plaintiff re-alleges and incorporates herein by reference the allegations in paragraphs 1 through 139 as if fully set forth herein.

141.    Genting Americas intentionally recorded, or caused to be recorded, illegitimate expenses and debt onto BBE's books and accounting records, which did not belong to BBE.

142.    Genting Americas knew that the illegitimate expenses and debt recorded on BBE's financials belonged to other entities in the Genting Group, not BBE.

143.    Genting Americas intentionally accrued interest on the illegitimate debt, which artificially increased BBE's liabilities.

144.    The illegitimate expenses, debt, and interest accrued thereon, comprise the vast majority of the liabilities recorded on BBE's annual financials beginning in 2014 and continuing uninterruptedly to the present.

145.    Upon information and belief, from approximately 2014 and continuing to the present, Genting Americas intentionally understated BBE's revenues, or caused same to be understated.

146.     Genting Americas knew that by shifting illegitimate expenses and debt onto BBE's books, BBE would not be able to pay down its legitimate debt and expenses, which in turn required BBE to obtain additional loans to operate and thereby increased its interest expense. Genting Americas also knew that this conduct would artificially increase BBE's losses and liabilities, which in turn would diminish the value of RAV's shares in BBE.

147.     Genting Americas wanted BBE's auditors, RAV, and other parties to rely on the accuracy of BBE's financial records.

148.     Genting Americas knew that BBE's auditors, RAV, and other parties would rely on the accuracy of BBE's financial records.

149.     BBE's auditors relied on the representations that the false expenses and debt belonged to BBE, and the auditors accounted for them on the audited financial reports as if those expenses were real.

150.     Relying on Genting Americas' representations and expertise in building and operating hotels and casinos, RAV believed that BBE's debts and expenses were legitimate, which allowed BBE's liabilities to grow and RAV's shares to diminish in value and amount.

151.     Genting Americas wanted to *inter alia* depress BBE's profits and increase the profits of other Genting Group members because Genting would have needed to share 50% and, later, 22%, of BBE's profits with RAV. But, by artificially increasing BBE's losses and liabilities, there were no profits to distribute to RAV.

152.      Moreover, Genting Americas wanted to increase BBE's liabilities to have them exceed the value of BBE's assets because, if and when the BBE Resort is sold, RAV would never realize any money from that sale, and would never receive any money for the land and licenses it contributed.

153.    Genting Americas' conduct caused RAV to be damaged in several ways, which include but are not limited to:

(a) depriving RAV of the entire value of the land and licenses it contributed to BBE;

(b) depriving RAV of the entire value of its shares in BBE; and / or

(c) depriving RAV of profits that it should have received from BBE.

154.    Genting Americas' intentional conduct warrants the imposition of punitive damages because it is wanton, willful and/or outrageous.

WHEREFORE, RAV demands a judgment against Defendant for (a) damages, including for compensatory, consequential, and punitive damages, (b) pre- and post-judgment interest, and (c) attorneys' fees and costs, and (d) any other relief this Court deems just and proper.

## COUNT II
### (CONSTRUCTIVE FRAUD)

155.    Plaintiff re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 139 as if fully set forth herein.

156.    Genting Americas owed a fiduciary duty to, or otherwise had a confidential relationship with, BBE and its shareholders, including RAV, because (a) it appointed its officers and directors to also act as officers and directors of BBE, and (b) it assumed control, and thereby the responsibility, of managing BBE's financials and the operation of BBE's Resort.

157.    RAV trusted Genting Americas and relied on Genting Americas' expertise in building and operating hotels and casinos.

158.    RAV also relied on Genting Americas to act honestly and in good faith when it was managing BBE's financials and operations.

159.    Genting Americas abused and took unconscionable advantage of RAV's trust and confidence when it artificially increased BBE's liabilities by:

(a) intentionally recording, or causing to be recorded, illegitimate expenses and debt onto BBE's books and accounting records, despite knowing that such debt did not belong to BBE;

(b) intentionally accruing interest on the falsely recorded expenses and debt; and

(c) intentionally understating BBE's revenues, or causing same to be understated.

160.    Genting Americas continues to abuse, and take unconscionable advantage of, RAV's trust and confidence because it continues to artificially maintain and increase BBE's liabilities.

161.    Genting Americas wanted to *inter alia* depress BBE's profits and increase the profits of other Genting Group members because Genting would have needed to share 50% and, later, 22%, of BBE's profits with RAV. But, by artificially increasing BBE's losses and liabilities, there were no profits to distribute to RAV.

162.    Moreover, Genting Americas wanted to increase BBE's liabilities to have them exceed the value of BBE's assets because, if and when the BBE Resort is sold, RAV would never realize any money from that sale, and would never receive any money for the land and licenses it contributed.

163.    Genting Americas' conduct caused RAV to be damaged in several ways, which include but are not limited to:

(a) depriving RAV of the entire value of the land and licenses it contributed to BBE;

(b) depriving RAV of the entire value of its shares in BBE; and / or

(c) depriving RAV of profits that it should have received from BBE.

164.    Genting Americas' conduct warrants the imposition of punitive damages.

WHEREFORE, RAV demands a judgment against Defendant for (a) damages, including for compensatory, consequential, and punitive damages, (b) pre- and post-judgment interest, and (c) attorneys' fees and costs, and (d) any other relief this Court deems just and proper.

## COUNT III
### (CONSPIRACY TO DEFRAUD)

165.    Plaintiff re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 139 as if fully set forth herein.

166.    Genting Americas conspired with

(a) one or more officers and/or directors of BBE, which persons included but are not limited to: Ed Farrell, Robert De Salvio, Dana Leibovitz, Jessica Hoppe, Hillary Metz, Kevin Jones, Colin Au, K.T., Aviv Laurence, Jamie Sanko, Patricia Missy Lawrence, Chet Koch, Stacey Rowland, Ann Kennedy, Terry Vavra, Susie Goh, Carlos Radas, Tom James, Shane Pomeroy, Walter Bogumil,

(b) one or more of following entities: ABC Biscayne, LLC, Bimini SuperFast Limited, Bimini SuperFast Charter Limited, Bimini SuperFast Operations, LLC, Genting New York, LLC, Genting Florida, LLC, RWBB Resorts Management, Ltd., RWBB Management, Ltd., Resorts World Aviation, LLC, Resorts World Miami, LLC, Resorts World Omni, LLC, Resorts World Las Vegas Hotels, LLC, Resorts World Las Vegas, LLC, Resorts World Las Vegas Hotels, LLC, RW Services, Pte Ltd., Genting North Americas Holdings, LLC, Genting Management Services, LLC, and / or

(c) other unknown co-conspirators, which may include natural persons and/or other entities in the Genting Group.

(collectively the "Co-Conspirators").

167.    Genting Americas conspired, and continues to conspire and work in concert, with one or more of the Co-Conspirators to artificially increase BBE's liabilities by:

(a) intentionally recording, or causing to be recorded, illegitimate expenses and debt onto BBE's books and accounting records, despite knowing that such expenses and debt did not belong to BBE;

(b) intentionally accruing interest on the falsely recorded expenses and debt; and

(c) intentionally understating BBE's revenues, or causing same to be understated.

168.    Genting Americas and / or one or more of the Co-Conspirators intentionally and artificially increased BBE's liabilities by recording illegitimate expenses and debt onto BBE's books and accounting records, accrued interest on same, and understated BBE's revenues.

169.    Genting Americas wanted to *inter alia* depress BBE's profits and increase the profits of other Genting Group members because Genting would have needed to share 50% and, later, 22%, of BBE's profits with RAV. But, by artificially increasing BBE's losses and liabilities, there were no profits to distribute to RAV.

170.    Moreover, Genting Americas wanted to increase BBE's liabilities to have them exceed the value of BBE's assets because, if and when the BBE Resort is sold, RAV would never realize any money from that sale, and would never receive any money for the land and licenses it contributed.

171.    Genting Americas' conduct caused RAV to be damaged in several ways, which include but are not limited to:

(a) depriving RAV of the entire value of the land and licenses it contributed to BBE;

(b) depriving RAV of the entire value of its shares in BBE; and / or

(c) depriving RAV of profits that it should have received from BBE.

172.    Genting Americas' conduct warrants the imposition of punitive damages.

WHEREFORE, RAV demands a judgment against Defendant for (a) damages, including for compensatory, consequential, and punitive damages, (b) pre- and post-judgment interest, and (c) attorneys' fees and costs, and (d) any other relief this Court deems just and proper.

## <u>COUNT IV</u>
### (TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP)

173.    Plaintiff re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 139 as if fully set forth herein.

174.    BBE's officers and directors owe a fiduciary duty, including a duty of loyalty, to BBE and its shareholders, including RAV.

175.    By virtue of that fiduciary relationship, RAV enjoyed an advantageous business relationship with BBE's officers and directors.

176.    Genting Americas knew those business relationships existed because it appointed several people to serve as BBE's officers and directors.

177.    Genting Americas intentionally and unjustifiably interfered with those advantageous business relationships when it helped, or caused, the BBE officers and directors that it had appointed to:

> (a) intentionally record, or cause to be recorded, illegitimate expenses and debt onto BBE's books and accounting records, despite knowing that such debt did not belong to BBE;
>
> (b) intentionally accrue interest on the falsely recorded expenses and debt; and
>
> (c) intentionally understate BBE's revenues, or causing same to be understated.

178.    Genting Americas intentionally and unjustifiably continues to interfere with those advantageous business relationships because it continues to help, or cause, the BBE officers and directors that it had appointed to engage in the same misconduct.

179.    Genting Americas wanted to *inter alia* depress BBE's profits and increase the profits of other Genting Group members because Genting would have needed to share 50% and, later, 22%, of BBE's profits with RAV. But, by artificially increasing BBE's losses and liabilities, there were no profits to distribute to RAV.

180.    Moreover, Genting Americas wanted to increase BBE's liabilities to have them exceed the value of BBE's assets because, if and when the BBE Resort is sold, RAV would never

realize any money from that sale, and would never receive any money for the land and licenses it contributed.

181.    Genting Americas' conduct caused RAV to be damaged in several ways, which include but are not limited to:

> (a)  depriving RAV of the entire value of the land and licenses it contributed to BBE;
>
> (b)  depriving RAV of the entire value of its shares in BBE; and / or
>
> (c)  depriving RAV of profits that it should have received from BBE.

182.    Genting Americas' conduct warrants the imposition of punitive damages.

WHEREFORE, RAV demands a judgment against Defendant for (a) damages, including for compensatory, consequential, and punitive damages, (b) pre- and post-judgment interest, and (c) attorneys' fees and costs, and (d) any other relief this Court deems just and proper.

## COUNT V
### (NEGLIGENCE)

183.    Plaintiff re-alleges and incorporates by reference herein the allegations in paragraphs 1 through 139 as if fully set forth herein.

184.    Genting Americas assumed the responsibility of preparing, maintaining, and controlling BBE's financial and accounting records.

185.    Accordingly, Genting Americas had a duty to prepare, maintain, and control BBE's financial and accounting records accurately and/or in commercially reasonable manner.

186.    Genting Americas has breached its duty, and continues to breach its duty because:

> (a)  illegitimate expenses and debt, that does not belong to BBE, was recorded on BBE's books and accounting records;
>
> (b)  interest was accrued on the illegitimate expenses and debt; and
>
> (c)  BBE's revenues were understated.

187.    Genting Americas knew, and it was otherwise reasonably foreseeable, that artificially increasing BBE's losses and liabilities was wrong, and that doing so would artificially depress the distribution of profits to BBE's shareholders, and ultimately dilute the amount and value of RAV's shares in BBE.

188.    Genting Americas' conduct caused RAV to be damaged in several ways, which include but are not limited to:

    (a) depriving RAV of the entire value of the land and licenses it contributed to BBE;

    (b) depriving RAV of the entire value of its shares in BBE; and / or

    (c) depriving RAV of profits that it should have received from BBE.

189.    Genting Americas' conduct warrants the imposition of punitive damages because its lack of care was (a) consciously indifferent to the consequences of its conduct and (b) recklessly indifferent to RAV's rights to such a degree as to be equivalent to an intentional violation of RAV's rights.

WHEREFORE, RAV demands a judgment against Defendant for (a) damages, including for compensatory, consequential, and punitive damages, (b) pre- and post-judgment interest, and (c) attorneys' fees and costs, and (d) any other relief this Court deems just and proper.

## JURY TRIAL DEMAND

RAV demands a jury trial on all issues so triable.

Dated: October 7, 2024.

[*Signature block on following page*]

Respectfully submitted,

**BELL ROSQUETE REYES ESTEBAN, PLLC**
999 Ponce De Leon Blvd., Suite 810
Coral Gables, Florida 33134
Telephone: (305) 570-1610
AEsteban@brresq.com
ARosquete@brresq.com
JReyes@brresq.com

By: */s/ Alexander Esteban*
Alexander Esteban, Esq.
Florida Bar No. 107491
Armando Rosquete, Esq.
Florida Bar No. 648434
Javier A. Reyes, Esq.
Florida Bar No. 688487